IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DUANE FISHER,                          §
                                       §
        Plaintiff,                     §
                                       §
vs.                                    §        CIVIL ACTION NO. H-12-1114
                                       §
BILLY HIRSCH and TEXAS                 §
DEPARTMENT OF CRIMINAL JUSTICE,        §
                                       §
        Defendants.                    §

MEMORANDUM AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #12). In this case, Duane Fisher ("Plaintiff," "Fisher"), proceeding *pro se*, complains that his former supervisor, Warden Billy Hirsch ("Hirsch"), and his former employer, the Texas Department of Criminal Justice ("TDCJ"), (collectively, "Defendants") discriminated against him due to his disability, and retaliated against him for seeking information on matters relevant to his employment. The parties have filed cross motions for summary judgment, and each has responded in opposition to the other's motion. (Plaintiff's Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry #51; Defendants' Motion for Summary Judgment ["Defendants' Motion"], Docket Entry #50; Plaintiff's Response to Defendants['] Motion for Summary Judgment ["Plaintiff's Response"], Docket Entry #52; Defendants' Response in Opposition to Plaintiff's Motion for Summary Judgment ["Defendants' Response"], Docket Entry #53). After considering the pleadings, the evidence submitted, and the applicable law, it is

RECOMMENDED that Defendants' motion be GRANTED, that Plaintiff's motion be DENIED, and that this case be DISMISSED.

**Background**

From September 12, 2005, until his termination on November 18, 2011, Duane Fisher worked for TDCJ as a correctional officer in the Goree Unit. (Defendants' Motion at Exhibit ["Ex."] 1, at 3; Civil Cover Sheet, Docket Entry #1-2, at 1; Plaintiff's Motion at Ex. 1, at 8). Fisher was supervised by Billy Hirsch, a senior warden. (*Id.*). Fisher suffers from Tourette's syndrome, which causes facial tics, such as "blinking" or "winking," as well as occasional hand spasms.[1] (*Id.* at Ex. 5, at 3, 12; Charge of Discrimination ["Charge"], Docket Entry #1, at 3).

During his employment, Fisher was the subject of five formal disciplinary actions for infractions of the "General Rules of Conduct and Disciplinary Action Guidelines for Employees." (Defendants' Motion at Ex. 1, at 3). The first two disciplinary actions were for "Use of Slurs/Hostile Epithets," and for "Substandard Duty Performance." (*Id.* at 4). A hearing on both of these reported infractions took place on July 26, 2004. (*Id.* at 4-5). Fisher was found "not guilty" of the first accusation, and was "reprimand[ed] only" for the second. (*Id.* at 4-5). Another disciplinary report was issued for "Sleeping on Duty," after Fisher was allegedly observed lying on the floor and failed to respond to questioning. (*Id.* at Ex. 1, 5-6 & 4, 15-19). At a hearing held on September 29, 2010, the charge was reduced to "Substandard Duty Performance," and Plaintiff was given "four months['] probation and 3 work days['] suspension" for that work place violation. (*Id.* at Ex. 1, 6 & 4, 15).

---

[1] At his deposition, Fisher stated that he also has dyslexia, but he testified that his disability claim concerns only his Tourette's Syndrome. (Defendants' Motion at Ex. 5, at 11-12).

The remaining two disciplinary actions are at issue in this case, and are central to Fisher's claim. However, Fisher also alleges that, prior to the disciplinary actions at issue, TDCJ had him involuntarily committed to a mental hospital, under false pretenses.

*Involuntary Commitment*

On September 24, 2009, while at work, Fisher developed "nausea" and a serious headache. (*Id.* at Ex. 5, at 32). He claims that this was likely caused by "high blood pressure and stress."[2] (*Id.* at Ex. 5, at 18). Fisher asked Lieutenant Francisco Villegas ("Lt. Villegas"), his shift supervisor, if he could go home, but changed his mind before receiving an answer.[3] Throughout his shift, co-workers, including Officer Keith White ("White") and Officer Mary Zimmer ("Zimmer"), told Fisher that he did not seem "well," and suggested that he go home. (*Id.* at Ex. 5, at 32-33 & 6, at 5). Fisher declined. (*Id.*).

Fisher states that, during this shift, he observed that "White had some medication in his bag on a podium, and [claims that he] pointed out to him that his medication was not supposed to be sitting out in the open like that." (*Id.* at Ex. 5, at 25). He contends that the medication later disappeared.[4] (*Id.*). According to TDCJ records, as the shift continued, Officer White informed Lt. Villegas that "Fisher was acting strange and not like himself." (*Id.* at Ex. 6, at 1-16). White also told Lt. Villegas that Fisher had commented that, among other reasons, he did not want to go

---

[2] In his deposition, Fisher stated that his "blood pressure and stress" levels were elevated that day because of Lt. Villegas' presence. (*Id.* at Ex. 5, at 18). He explained that Lt. Villegas was a "bully," because "he liked writing people up so he could be promoted." (*Id.*). Fisher also testified, however, that he "really didn't have to deal with [Lt. Villegas] much," and formed his opinion that the lieutenant was a "bully" because of actions he witnessed towards other colleagues. (*Id.*).

[3] Fisher claims that he decided against going home because it would have been a "waste of gas." (*Id.* at Ex. 5, at 32).

[4] There is no evidence to corroborate this claim. However, it is Fisher's contention that White and Lt. Villegas arranged the subsequent "involuntary commitment" on false pretenses, so that he would be "drug tested and detained against [his] will." (Complaint at 1; Charge at 3).

3

home because "he had guns in the house." (*Id.*).  Lt. Villegas talked to Fisher, who admitted that he was not feeling "right," but was adamant that he did not "want to talk about" it.[5]  (*Id.*).  Lt. Villegas informed Fisher about TDCJ's employee assistance program ("EAP").  (*Id.*).  Fisher accepted the telephone number for the EAP.  (*Id.*).  Lt. Villegas then instructed Fisher to wait while he discussed the matter with A. McComb ("Warden McComb"), the Duty Warden.  (*Id.*).

Warden McComb advised Lt. Villegas to contact EAP immediately.  (*Id.*).  "Ms. Amanda" ("Amanda"), an EAP representative, called to speak with Fisher.  (*Id.*).  After unsuccessfully attempting to speak with Fisher, Amanda advised Lt. Villegas to take Fisher "to the local hospital [for] a Psychological Evaluation." (*Id.*).  Fisher refused a voluntary evaluation, however, so Lt. Villegas called "911" for local law enforcement assistance.  (*Id.* at Ex. 6, at 7).  Before the police arrived, Fisher attempted to leave, even though his shift had not ended.  (*Id.*).  Because Lt. Villegas had ordered Fisher to remain on the premises, D. Eddy ("Eddy"), a Control Picket Officer, stopped him.  (*Id.*).  Eventually, officers with the Huntsville Police Department and two paramedics arrived at the Unit.  (*Id.*).  The police officers spoke with Fisher and with the TDCJ officials.  (*Id.*).  Fisher again refused to submit to a psychological evaluation.  (*Id.* at Ex. 6, at 1).  At that time, the officers determined that Fisher's welfare was a concern, and that, if allowed to return to his home, he "would present a danger to himself and others." (*Id.*).  The officers then restrained Fisher, informed him that he was in "protective custody," and transported him to the hospital.  (*Id.*).  Fisher remained in the hospital for five days.  (*Id.* at Ex. 5, at 25).  According to Fisher, when discharged, he was not given a diagnosis, prescriptions, or

---

[5] Lt. Villegas claims that he asked Fisher if he was thinking about hurting himself, but Fisher denies this claim. (Defendants' Motion at Ex. 5, at 33).

instructions to schedule a follow-up appointment.  (*Id*).  No disciplinary proceedings were initiated based on the incident.

### Insubordination

Almost one year later, Fisher was called to Lt. Villegas's office to discuss his allegedly improper behavior during "shift turnout."  (Plaintiff's Motion at Ex. 1, at 2).  Sergeant Joseph Cobbs ("Sgt. Cobbs") was also present at this meeting.  (*Id*.).  Fisher concedes that he rolled his eyes during the meeting, but contends that it was a side effect of either Tourette's Syndrome or the proximity of a pepper spray container in the office.  (Defendants' Motion at Ex. 5, at 17).  In any event, Fisher walked out before the meeting was over.  (Plaintiff's Motion at Exhibit ["Ex."] 1, at 2).  According to Lt. Villegas, when he attempted to stop him, Fisher called him a "dumbass."  (*Id*. at 30, 32 & Ex. 1, at 2).  As a result, Lt. Villegas issued a disciplinary report, citing Fisher for insubordination.  (*Id*.).

Captain Mike Hodges ("Hodges") investigated the charge, and recommended that a hearing take place.  (Defendants' Motion at Ex. 1, at 5).  At that hearing, on August 20, 2010, before Warden Detrah Lacy ("Warden Lacy"), both Fisher and Lt. Villegas presented their version of events.  (Plaintiff's Motion at Ex. 1, at 2, 7).  Warden Lacy concluded that Fisher was guilty of "Insubordination," and she assessed a three-month probation as punishment.  (*Id*. at Ex. 1, at 2; Defendants' Motion at Ex. 1, at 5).

On August 24, 2010, Fisher filed a Step I Grievance.  (Plaintiff's Motion at Ex. 1, at 2, 7, 8).  A hearing on that grievance was held on September 30, 2010, before Warden Hirsch.  (*Id*.).  Fisher attended the hearing with Fritz Barnett, his attorney.  (*Id*.).  Also present was Carla Cordova Willis, an attorney for TDCJ.  (*Id*.).  Fisher's chief complaints were, as follows:

> Warden Lacy did not give him a fair opportunity to present evidence at the 08/10/2010 hearing because he was not "allowed to call Sgt. Cobb[s] as a witness

5

> [and] Warden Lacy chose to believe Lt. Villegas['] unverified and unsworn
> written statement rather than [Fisher's] word.

(*Id.* at Ex. 1, at 7).  During the hearing, Hirsch pointed out that, in the meeting with Lacy, Fisher

never "mention[ed] Sgt. Cobb[s] as a witness." (*Id.*).  Fisher told Warden Hirsch that he wanted

to call Dawn Susick ("Susick"), a human resources representative, to testify in his behalf. (*Id.*).

Warden Hirsch responded, however, that Ms. Susick was not a witness to the incident. (*Id.*).

Hirsch also told him that, in the "Guidelines for Employee Hearings," it is clear that it is Fisher's

sole responsibility to arrange for witness testimony. (*Id.*).  Warden Hirsch concluded that the

matter "comes down to Warden Lacy considering [the] testimony] of both Lt. Villegas and

Fisher, and determining that Lt. Villegas's testimony was more credible." (*Id.*).  Warden Hirsch

decided to uphold Warden Lacy's findings and the three-month probation that she had imposed.

(*Id.*).

On October 22, 2010, Fisher filed a Step II Grievance, "contend[ing] that he was not

guilty and request[ing] that the disciplinary be overturned and removed from his record." (*Id.* at

Ex. 1, at 2-3).  On November 10, 2010, a hearing took place before Michael Upshaw

("Upshaw"), TDCJ's Region I Director. (*Id.*).  Fisher was "allowed to tell his side of the story as

well as to present any evidence to support his claim." (*Id.*).  After the hearing, Upshaw

"reviewed the employee disciplinary, employee performance log and the Step I response," and

questioned Lt. Villegas and Sgt. Cobbs. (*Id.*).  On November 24, 2010, Upshaw concluded that

"Mr. Fisher's actions while be[ing] counseled by his shift supervisor were insubordinate," and he

denied the grievance. (*Id.*).

On December 8, 2010, Fisher filed a Step III Grievance, claiming that Lt. Villegas's

"lies" were being credited over his version of events. (*Id.* at Ex. 1, at 3, 9).  He stated that this

6

showed that his employers were "continu[ing] to side [with Villegas's] vendetta against [him]."

(*Id.*). Fisher also made the following statement:

> I was not given the opportunity to present my side and the disciplinary decisions against me are predicial [sic] and discriminating against my 'genetic'[.] I was not given the opportunity to due process. <u>Warden Lacy predicable [sic] discriminating statement</u> against <u>what happened to me on September 24, 2010.</u>[6] Further on going retaliatory action that has been ignored and unaddressed.

(*Id.* at Ex. 1, at 3 [emphasis in original]).  On December 20, 2010, another hearing, before Jason Heaton ("Heaton"), the Director of Correctional Training, took place.  (*Id.* at Ex. 1, at 4).  Heaton gave Fisher an opportunity to explain his grievance, and the following occurred:

> You claimed that you were found guilty only because Warden Lacy believed Lieutenant Villegas over you.  However, Mr. Heaton specifically asked you if you raised your voice at Lieutenant Villegas and you stated, "yes."  Mr. Heaton also spoke with Sergeant Cobbs, who stated you became upset as a result of the performance log entry.  He further stated that he did not hear you use a derogatory term, but did hear you raise your voice toward Lieutenant Villegas.  Lieutenant Villegas maintained his statement of your actions as they were written in the disciplinary [report].

(*Id.*).  The evidence was subsequently reviewed by Rick Thaler ("Thaler"), Director of the Correctional Institutions Division.  (*Id.*).  On January 3, 2011, Thaler issued the following decision:

> Based on the statements of Lieutenant Villeges and Sergeant Cobbs, as well as your admission to Mr. Heaton that you did raise your voice directed at Lieutenant Villegas, it is clear that you did violated PD-22, Level 3, Rule 36 *Insubordination*.  Therefore, I am denying this grievance and the requested relief.

(*Id.*).  As a result, the disciplinary action was upheld.

---

[6]   It is unclear what occurred on September 24, 2010.  From a review of other records, it is presumed that Fisher is referring to the grounds for his grievances.

*"Violation of Statutory Authority/Court Order/Rules/Regulations/Policies"*

As a correctional officer, one of Fisher's duties was to perform "formal counts [of offenders] in order to provide and maintain the security of the areas of the prison to which he is assigned." (Defendants' Motion at Ex. 4, at 2). TDCJ policy requires "that a minimum of 8 'formal' counts be performed within a 24 hour period," during specified times of the day. (*Id.* at 3). According to that policy, "a cellblock officer is not authorized to perform a formal count at an arbitrary time, rather he must perform the count during count time." (*Id.*). The policy also provides that, "[b]ecause of the severity of the offense, ... dismissal of the employee will be recommended on the first offense." (*Id.*).

On September 24 or 25, 2011,[7] Sergeant Jimmy Donald ("Sgt. Donald") received an "anonymous" complaint that Fisher had failed to do a proper headcount of the inmates. (Plaintiff's Motion at Ex. 1, at 6). As a result, on September 25 or 26, 2011, Sgt. Donald set up a video recorder, at the Goree Unit, "to monitor Officer Fisher[']s count procedures" during the time each count should be taken. (*Id.* at 21 & Ex. 1, at 6). The resulting video showed that neither Fisher nor another employee, Officer David Resnick ("Resnick"), made the required count. (*Id.* at 8-9 & Ex. 1, at 6). Further, according to TDCJ, on September 26, 2011, Sgt. Donald watched Fisher from 1:45 a.m. until 2:20 a.m., during which the 2:00 a.m. count should occur. (*Id.* at Ex. 1, 16). Donald "never observed [him] walk and count the offenders on the cellblock during this time," and neither did Resnick, yet Fisher "phoned in a count of 26 and submitted a count sheet signed by ... Resnick." (*Id.*). Sgt. Donald reported Fisher for a *"Violation of Statutory Authority/Court Order/Rules/Regulations/Policies."* (*Id.* at 8-9 & Ex. 1, at 6; Defendants' Motion at Ex. 1, at 6).

---

[7] There are discrepancies about dates throughout the record.

8

Fisher, however, describes the events of September 26 differently, as follows:

Statement of Duane Ray Fisher
September 25 and 26 2011

At approximately 2:00AM I performed a **"General Count Procedure"** and counted "26" Offenders on one-south-cell-block area. Officer Resnick cross count[ed] "26." At 2:30 AM I opened the "crash gate" doors for Sergeant Donald as he proceeded to run through the one-south-cell-block area.

At approximately 2:45 AM I received a phone call from Lieutenant Bailey that I was being written up for my "count procedures." I informed him that I have been doing my job for over 6 years and I have not made any incorrect counts.

According to **building** schedule, at approximately 3:30 AM two assigned Offenders arrived to feed the cell block Offenders. I escorted them up and down as they served and retrieved the trays.

At approximately 4:15 AM I performed **"General Count Procedure"** and counted "26" Offenders. Officer Larson was working One-North-Cell-Block area along with Officer Resnick and Officer Larson decided to cross count and he reassured me the count was "26"! At 4:25 AM I was escorting the Unit Nurse V. Lenoir as she would wake up all the Offenders to inform them she was on the run and there to address their medical issues if needed. Count cleared approximately 5:00 AM. Shortly after Nurse Lenoir left and at approximately 5:10 AM I escorted "Pill lady" Nurse Y. Smith as she dispensed medication to the Offenders.

At approximately 5:55 AM I was relieved by First shift Officer as I informed him that the only incident to report was the Offender in #17 cell and no other report and that the count was "26!"

(Plaintiff's Response at 27 [emphasis in original]).

Captain Hodges was assigned to investigate the incident. (Plaintiff's Motion at 19). Hodges reviewed the video and interviewed Fisher. (*Id.* at 19, 37). Hodges also interviewed Resnick, who "told [him] that ... neither one of them actually performed a physical count." (*Id.*). On October 13, 2011, a disciplinary hearing took place before Warden Hirsch. (*Id.* at Ex. 1, at 11). In attendance were Fisher, Susick, and Erik Brown ("Brown"), from the Office of General Counsel. (*Id.*). After the hearing, Hirsch found Fisher guilty of the infraction, and recommended his dismissal. (*Id.*). The reprimand and the recommendation of dismissal were then reviewed,

9

approved, and signed by the following officials:  Brown, a TDCJ attorney, on November 1, 2011; Jan Thorton ("Thorton"), Human Resources Director, on November 7, 2011; Upshaw, the Regional Director, on November 10, 2011; William Stephens ("Stephens"), Deputy Director of TDCJ, on November 18, 2011; and, finally, Thaler, also on November 18, 2011.  (*Id.* at Ex. 1, at 13-15).

In the interim, on October 14, 2011, while the recommendation for termination was being reviewed by prison officials, TDCJ's Employee Relations department sent Fisher a notice explaining that he had a right to attend a mediation.  (Plaintiff's Response at 7).  The notice directed Fisher to complete an enclosed from and attach a cashier's check or money order in the amount of $50, payable to "TDCJ," by October 31, 2011, if he chose to utilize the mediation process.  (*Id.*).  Fisher did not take advantage of the mediation process, however, for the following reasons:

> A cashier's check is [sic] to be "made out to TDCJ" is not independent Mediation, for $50 cashiers check is not constitutional according to "Due Processes." Just the sure fact of making out a $50.00 cashier's check contribution is an admission of guilt.  The Plaintiff was doing his job and was "not guilty!"

(*Id.* at 1 [emphasis in original]; *see* Motion at Ex. 1, at 16).

On October 28, 2011, Fisher filed a Step I Grievance, seeking a reversal of "the decision to terminate."  (*Id.*).  In that grievance, Fisher complained that he "did not receive any written rule, policy or video recording [at the hearing] to support [Hirsch's] decision to terminate [his] employment."  (*Id.*).  He also stated that he believed that the decision to terminate him was made in retaliation for his "[g]rieving matters of importance."  (*Id.*).  On November 3, 2011, that grievance was returned to Fisher as improperly submitted.  (Plaintiff's Response at 22-23).  On November 29, 2011, Daniel Maeso ("Maeso"), an attorney who was then representing Fisher, sent a letter to Brad Livingston ("Livingston"), Executive Director of TDCJ, to protest the

10

termination. (Plaintiff's Motion at Ex. 1, at 19). In that letter, Maeso complained that, during

his employment at TDCJ, Fisher,

> received and witnessed the abuse by supervisors on Correctional Officers and
> Offenders. Instead of standing by, he has brought many of these to the attention
> of supervisors to no avail. In retaliation, he has been the target of undeserved
> disciplinary actions, culminating with his termination, totally in the absence of
> Due Process.... When informed at the unit that he was terminated on October 13,
> 2011, and they took his uniform and security badge, he was not informed of the
> period of time it would take for your office to make the final determination of
> termination and in the meantime he was floating without a job, even though he
> had been "terminated."
>
> *   *   *
>
> I intend to see that Mr. Fisher receives the Due Process he deserves.

(*Id.*). Fisher filed another grievance, on December 7, 2011. (*Id.* at Ex. 1, at 18). A hearing on

the matter was held on January 6, 2012. (*Id.* at Ex. 1, at 16). At the hearing, Fisher and Maeso

were present, and the hearing was conducted by Thaler's designee, Thomas Prasifka

("Prasifka"), Deputy Director of Support Operations. (*Id.*). Prasifka found that, contrary to

Fisher's contention, Susick had given him a copy of the written rule that he was accused of

violating. (*Id.*). He also determined that the video recording "was not utilized in the decision

making process for [his] disciplinary," so it was not necessary for Fisher to have received a copy

of it. (*Id.*). Prasifka further found that Fisher "w[as] provided copies of all the statements

utilized in the hearing." (*Id.*). And Prasifka pointed out that Fisher never asked to have

witnesses attend the prior disciplinary hearing. (*Id.* at Ex. 1, at 17). Fisher's counsel raised a

further issue at the hearing, namely, "the severity of the punishment." (*Id.*). Prasifka "explained

that the punishment was within the guidelines for a Level 2 offense with one prior rule

violation," citing, in this case, the "Insubordination" charge. (Defendants' Motion at Ex. 1, at 7).

Prasifka emphasized "the importance of counting at the designated count time" and pointed out

that counting "was a basic function of [his] job responsibility which relates to public safety."

(Plaintiff's Motion at Ex. 1, at 17). After the hearing, Thaler reviewed the record, including Prafiska's findings, and interviews with Warden Hirsch, Lt. Bailey, and Sgt. Donald. (*Id.*). On January 19, 2012, in a written decision, Thaler concluded, as follows:

> Based on the preponderance of credible evidence, it appears the finding of guilty was appropriate and the punishment imposed was within the guidelines. Your grievance is denied and the recommendation for termination will be upheld.

(*Id.* at Ex. 1, at 16-17). Resnick was also terminated for the offense. (Defendants' Motion at Ex. 4, at 4 & 5, at 35).

*The Pending Claims*

Fisher claims that his involuntary commitment and his disciplinary proceedings while with TDCJ were the result of discrimination, based on his disability, and retaliation for complaining about the discipline. (*Id.* at Ex. 5, at 47). He asserts, for instance, that on September 24, 2009, "Villegas took the word of a drug addict co-worker and did not immediately investigate the accusation." (*Id.*). He claims that Lt.Villegas "[w]aited 4 hours, locked down the Prison Unit (official oppression) and ha[d] Duane Fisher arrested." (*Id.*). He also contends that Villegas ordered a co-worker, Officer Eddy, "to falsify an IOC [inter-office communication] to collaborate [sic] his embellishment to state that Duane Fisher tried to leave a locked down unit several times." (*Id.*). Fisher states that he "wrote grievances about the incident to the administration," and that, in response, "they retaliated," as follows:

> Supervisors started to harass Plaintiff by fabricating major disciplinary charges just to firing [sic] Duane Fisher. Francisco Villegas accused Duane Fisher of being disrespectful in turnout, using his disability against him, embellished a deceitful insubordination charge! Upper Administration and Supervisors labeled Mr. Fisher a "trouble maker" for writing grievances is [sic] discrimination.

(*Id.*). Fisher complains that other discriminatory and retaliatory actions taken against him include a refusal to give him copies of records from his "arrest"; harassment; probation; denial of

12

his request to transfer to another unit; and attempts to force him to quit before his retirement date. (*Id.*; Civil Cover Sheet at 1; Original Complaint ["Complaint"], Docket Entry #1-1, at 1-2). As a result, on July 21, 2010, while he was still employed, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Charge at 3). In his EEOC charge, Fisher claimed that he was being discriminated against because of his disability, Tourette's syndrome, and that he was also the victim of retaliation. (*Id.*). On December 20, 2011, the EEOC issued Fisher a right-to-sue letter. (Notice of Right to Sue ["Notice"], Docket Entry #1, at 6). On April 10, 2012, Fisher filed this lawsuit. (Docket Entry #1).

On April 15, 2013, Defendants filed their motion for summary judgment, raising a number of arguments. (Defendants' Motion at 1-2). Defendants contend, first, that Fisher's claim of unlawful termination must be dismissed because he failed to exhaust his administrative remedies. (*Id.* at 1). Next, they state that Fisher's claim of discrimination must be dismissed, because he has provided no evidence of a similarly situated employee who was treated differently, or any evidence to rebut their legitimate, nondiscriminatory reason for the employment decision. (*Id.*). Defendants argue that Fisher's retaliation claim should be dismissed, because he has failed to demonstrate a causal connection between any protected activity, and any adverse employment action, nor did he provide any evidence to rebut their legitimate, nondiscriminatory reason for the alleged retaliatory conduct. (*Id.* at 2). Defendants contend, as well, that Fisher's claims under 42 U.S.C. § 1983 against Hirsch, which are premised on agency or vicarious liability, should be dismissed, as a matter of law, and that Warden Hirsch is, in any event, protected from liability under the doctrine of qualified immunity. (*Id.*). Further, Defendants argue that all of Fisher's § 1983 claims against TDCJ must be dismissed, as a matter

13

of law. (*Id.*). And, finally, Defendants claim that Fisher has stated no ground for injunctive relief. (*Id.*). In his own motion for summary judgment, Fisher argues that there is sufficient evidence to warrant judgment in his favor without trial. (Plaintiff's Motion at 1). Having considered the pleadings, the evidence, and the applicable law, it is recommended that Defendants' motion be granted, and that Plaintiff's motion be denied.

**Standard of Review**

Summary judgment is appropriate when "'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant[] [is] entitled to judgment as a matter of law.'" *Pustejovsky v. Pliva, Inc.*, 623 F.3d 271, 275 76 (5th Cir. 2010) (quoting FED. R. CIV. P. 56(c); citing *Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 364 (5th Cir. 2009)). "'Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'" *Hillman v. Loga*, 697 F.3d 299, 302 (5th Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Under Rule 56(c), the moving party "bears the initial burden of 'informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003). The party moving for summary judgment "'must demonstrate the absence of a genuine issue of material fact,' but 'need not negate the elements of the non-movant's case.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)); *see Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). If the moving party fails to meet its initial burden, its motion for summary

14

judgment must be denied, regardless of the non-movant's response. *See Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001); *Little*, 37 F.3d at 1075.

When the moving party has met its Rule 56 burden, the non-moving party cannot merely rest on the allegations in his pleadings. *See Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 50 (5th Cir. 2005); *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995). Rather, he is required to "'go beyond the pleadings'" and produce probative evidence to show "'that there is a genuine issue for trial.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075; citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87); *see Izen v. Catalina*, 398 F.3d 363, 366 (5th Cir. 2005); *Taita Chem. Co.*, 246 F.3d at 385. If he does so, his evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Hillman*, 697 F.3d at 302; *Taita Chem. Co.*, 246 F.3d at 385. However, if the non-movant fails to respond appropriately, or if he fails to respond at all, summary judgment is not awarded to the moving party simply by default. *See Ford Evans v. Smith*, 206 Fed. Appx. 332, 334 (5th Cir. 2006); *Hetzel v. Bethlehem Steel Corp.*, 50 F.3d 360, 362 n.3 (5th Cir. 1995); *Hibernia Nat'l Bank v. Administracion Cent. Soc. Anonima*, 776 F.2d 1277, 1279 (5th Cir. 1985); *John v. State of La.*, 757 F.2d 698, 708 (5th Cir. 1985). Instead, as always, summary judgment is appropriate only if the moving party has demonstrated the absence of a genuine issue of material fact, and shown that judgment is warranted as a matter of law. *See Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006); *Hetzel*, 50 F.3d at 362 n.3 (quoting *Hibernia Nat'l Bank*, 776 F.2d at 1279).

## Discussion

In this case, Fisher claims that he was "continually harassed and discriminated against" at work because he suffers from Tourette's syndrome. (Charge at 3). Fisher complains, as well,

that Defendants retaliated against him for filing grievances and for seeking information about his involuntary commitment. (*Id.*; Complaint at 1). Fisher further complains that his supervisors were "trying to cause [his] termination in order to deny [him his] retirement," which was to occur on April 14, 2011. (*Id.*). Fisher contends that he was ultimately terminated as a result of ongoing discrimination and retaliation. (Civil Cover Sheet at 2).

### Pro Se Representation

As a preliminary matter, Fisher points out that he is not represented by counsel, and that he has no legal training. (Plaintiff's Response at 1). It is true that when a plaintiff is proceeding *pro se*, "the court must afford his pleadings a liberal construction." *Propes v. Quarterman*, 573 F.3d 225, 228, 231 (5th Cir. 2009); *see Royal v. Tombone*, 141 F.3d 596, 599 n.4 (5th Cir. 1998). However, it is well settled that a *pro se* plaintiff is expected to comply with "basic procedural obligations." *Propes*, 573 F.3d at 231 (citing *United States v. Petty*, 530 F.3d 361, 365-66 (5th Cir. 2008)); *see Teemac*, 298 F.3d at 457. As a rule, then, although he is not represented by an attorney, Fisher is expected to comply with the procedural obligations for filing an employment discrimination suit. *See id.* at 457 & n.11; *see also Propes*, 573 F.3d at 231.

### Exhaustion

Defendants argue that, because he was fired after he filed his charge of discrimination, Fisher cannot pursue any claim stemming from his termination without first exhausting all administrative remedies.[8] (Defendants' Motion at 1, 3-10). "Employment discrimination

---

[8] The majority of Defendants' summary judgment arguments are relevant to a Title VII claim. That statute, however, "does not protect against ... disability discrimination." *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). Instead, the Americans with Disabilities Act ("ADA") "'provide[s] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Lanier v. University of Tex. SW Med. Ctr.*, ___ Fed. Appx. ___, 2013 WL 2631316, at *2 (5th Cir. June 12, 2013). Fisher has not brought any claims under Title VII. However, "[t]he ADA exhaustion procedures are the same as those applicable to discrimination claims pursuant to

plaintiffs must exhaust administrative remedies before pursuing claims in federal court." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378-79 (5th Cir. 2002); *accord Dao*, 96 F.3d at 788-89. "Exhaustion occurs when the plaintiff files a timely charge with the EEOC and receives a statutory notice of right to sue." *Taylor*, 296 F.3d at 379 (citing *Dao*, 96 F.3d at 788-89). Ordinarily, an employee may not base an employment discrimination claim "on an action that was not previously asserted in a formal charge of discrimination to the EEOC, or that could not 'reasonably be expected to grow out of the charge of discrimination.'" *Filer v. Donley*, 690 F.3d 643, 647 (5th Cir. 2012) (quoting *Pacheco v. Mineta*, 448 F.3d 783, 789 (5th Cir. 2006)). In determining the scope of a charge, the court engages in a "fact intensive analysis of the statement given by the plaintiff in the administrative charge, and look slightly beyond its four corners, to its substance rather than its label." *Pacheco*, 448 F.3d at 789 (citing *Fellows v. Universal Restaurants, Inc.*, 701 F.2d 447, 451 (5th Cir. 1983); *Fine v. GAF Chem. Corp.*, 995 F.2d 576, 578 (5th Cir. 1993)).

In this case, while Fisher had not been terminated at the time he filed his original charge with the EEOC, he was complaining that he was being discriminated against, due to his disability, and retaliated against for seeking information. (*See* Charge at 3). He also alleges in that complaint that his employer was threatening termination. Before this court, Fisher has brought the same claims, now adding that the threatened termination actually resulted. Under the law, then, it cannot be fairly said that Fisher has not exhausted his administrative remedies on the matter of his termination. Defendants' motion for summary judgment should be denied on this issue.

---

Title VII of the Civil Rights Act of 1964." *Kempton v. J.C. Penney's Co.*, 2013 WL 1869995, at *2 n.1 (S.D. Tex. April 18, 2013) (Owsley, J.) (citing *Dao v. Auchan Hypermarket*, 96 F.3d 787, 788-89 (5th Cir. 1996).

17

*Disability Discrimination*

In this lawsuit, Plaintiff claims that he was discriminated against because of his disability. (Complaint at 1-2). In its motion for summary judgment, TDCJ argues that Fisher's unlawful termination claim should be dismissed because he has provided no evidence of a similarly situated employee who was treated differently. (Defendants' Motion at 6-7). Defendants also claim that he has not raised any evidence to rebut their legitimate, nondiscriminatory reason for the employment decision. Fisher, on the other hand, contends that Defendants' evidence is flawed, and that there is no genuine issue of material fact that the prison is liable for discrimination based on his disability. (Plaintiff's Motion at 1; Plaintiff's Response at 1).

Under the ADA,

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). "A qualified individual is a person 'who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Milton v. Texas Dept. of Crim. Justice*, 707 F.3d 570, 572-73 (5th Cir. 2013) (quoting 42 U.S.C. § 12111(8)).

"The threshold issue in a plaintiff's *prima facie* case" under the ADA is whether he "suffers from a disability." *Lanier*, 2013 WL 2631316, at *2 (citing *Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1024 (5th Cir. 1999)). The ADA defines "disability," as follows:

> (A) a physical or mental impairment that substantially limits one or more major life activities [of such individual]; (B) a record of such an impairment; or (C) being regarded as having such an impairment.

18

42 U.S.C. § 12102(1).   In accordance with this language, the Fifth Circuit has held that, in order to establish a *prima facie* case of discrimination under the ADA, a plaintiff must make the following showing:

(i)   That he "suffers from a disability";

(ii)   That he "is qualified for the job";

(iii)   That he "was subject to an adverse employment action"; and

(iv)   That he "was replaced by a non-disabled person or was treated less favorably than non-disabled employees."

*Milton*, 707 F.3d at 573 (quoting *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995)).   Here, then, Plaintiff must first show that he "suffers from a disability." *See id.* "Merely having an 'impairment' does not make one disabled for purposes of the ADA." *Id.* "Rather, the impairment must substantially limit the individual." *Id.* (citing *EEOC v. Agro Distrib., LLC*, 555 F.3d 462, 469 (5th Cir. 2009)).   The phrase "'substantially limit[]' means a person is '[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.'" *Id.* (quoting *Argo Distrib., LLC*, 555 F.3d at 469 (quoting 29 C.F.R. § 1630.2(j)(1)(ii) (2008))).

In this case, Fisher testified, at deposition, that he has suffered from Tourette's syndrome, and its accompanying "facial tics" and muscle spasms, since childhood. (Defendants' Motion at Ex. 5, at 3, 12).   He offers no independent evidence to show that he suffers from this disorder. Fisher also testified that the symptoms of his Tourette's syndrome have improved significantly since childhood. (*Id.*).   In his deposition, he described his symptoms, at all times relevant to this lawsuit, as causing the occasional "facial tic," such as "blinking" or "winking," and an occasional hand spasm, which occurs primarily when he is under stress. (*Id.*).   Fisher offers no

testimony or other evidence that would support a claim that his disability "substantially limit[ed]" his ability to perform his job, or any other "major life activity." (*See id.*). Instead, it is clear that Fisher believes that his supervisors and co-workers either disliked, misunderstood, or teased him about his disability, and that the adverse employment actions arose in that context. (*Id.*). Unfortunately, none of these claims, nor the evidence, supports a finding that Tourette's syndrome was a qualifying disability for purposes of the ADA. *See Lanier*, 2013 WL 2631316, at *2 (citing *Talk*, 165 F.3d at 1024); *Milton*, 707 F.3d at 573; *Agro Distrib., LLC*, 555 F.3d at 469.

Defendants have shown, through Fisher's deposition testimony, that there is no genuine issue of material fact that Plaintiff suffers from a "disability," for purposes of a discrimination claim under the ADA. (Defendants' Motion at Ex. 5, at 3, 12). For that reason, alone, Fisher's discrimination claim must fail. *See Milton*, 707 F.3d at 573 (quoting *Daigle*, 70 F.3d at 396). Further, even assuming, for the sake of argument, that Fisher suffered from a disability at the relevant time, he has offered no evidence to show that he "was replaced by a non-disabled person or was treated less favorably than non-disabled employees." *See id.* On this record, then, summary judgment in favor of Defendants is warranted on Plaintiff's claim for disability discrimination.

*Retaliation*

In his lawsuit, Fisher also complains that he was retaliated against for filing grievances, and for seeking information regarding his involuntary hospital commitment in September 2009. (Complaint at 1-2). Defendants argue that summary judgment is appropriate on the retaliation claim, because "the undisputed material facts fail to demonstrate a causal connection between his

protected activity and any adverse employment action." (Defendants' Motion at 7-8). Plaintiff

seeks summary judgment in his favor. (Plaintiff's Motion at 1).

The ADA prohibits retaliation, as follows:

No person shall discriminate against any individual because such individual has
opposed any act or practice made unlawful by this chapter or because such
individual made a charge, testified, assisted, or participated in any manner in an
investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a). Under the ADA, a claim of unlawful retaliation requires a plaintiff to

make the following showing:

(i)     that he "engaged in protected activity";

(ii)    that he "suffered an adverse employment action"; and

(iii)   that "a causal connection existed between the protected act and the
        adverse action."

*Lanier*, 2013 WL 2631316, at *2; *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 317 n.3 (5th Cir.

2007). ADA retaliation claims "are analyzed under the *McDonnell Douglas* three-step

framework" that applies to claims brought under Title VII. *Id.* at 316-17 (citing *Sherrod v. Am.

Airlines, Inc.*, 132 F.3d 1112, 1121-22 (5th Cir. 1998)). As a result, if a plaintiff establishes a

*prima facie* case of retaliation, the defendant "must put forth a legitimate, nondiscriminatory

reason for the employment action." *Id.* at 317 (citing *Sherrod*, 132 F.3d at 1122); *accord

LeMaire v. Louisiana Dept. of Transp. & Dev.*, 480 F.3d 383, 388 (5th Cir. 2007). If the

employer does so, "the burden shifts back to the employee to demonstrate that the employer's

reason is actually a pretext for retaliation." *Id.* at 388-89; *see Jenkins*, 487 F.3d at 317.

In this case, there is no dispute that Fisher engaged in protected activity when he filed

grievances to protest disciplinary measures taken against him that he believed were based, at

least in part, on his disability. *See* 42 U.S.C. § 12203(a); *see also Evans v. City of Houston*, 246

21

F.3d 344, 352-53 (5th Cir. 2001) ("[i]f an employee has '"made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing, ..."' the employee has engaged in a protected activity"). Further, the record is replete with evidence, both documentary and testamentary, that Fisher filed grievances regarding all of the formal disciplinary actions that are at issue in this case. Plaintiff offers no proof, however, that he sought and was refused information regarding his involuntary commitment in September 2009. It appears, then, that Fisher has established the first element of his *prima facie* case of retaliation with regard to the grievances only. *See id.* Further, there is no question that Fisher suffered adverse employment actions, including probations and, ultimately, termination. *See Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir. 2007); *Jones v. Flagship Int'l*, 793 F.2d 714, 725 (5th Cir. 1986). To make a *prima facie* case of retaliation based on the grievances, then, Fisher has only to show that a "causal connection existed between the protected act and the adverse action." *See Lanier*, 2013 WL 2631316, at *2; *Jenkins*, 487 F.3d at 317 n.3. In the context of a Title VII claim, the United States Supreme Court recently held, as follows:

> retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.

*University of Tex. S.W. Med. Ctr. v. Nassar*, ___ S. Ct. ___, 2013 WL 3155234, at *15-16 (U.S. June 24, 2013). Even under a lesser standard, however, a plaintiff must show that there is some "causal connection" between "the protected act and the adverse action." *Lanier*, 2013 WL 2631316, at *2; *Jenkins*, 487 F.3d at 317 n.3.

In this case, although it is unclear, Plaintiff's first claim of retaliation appears to be related to the disciplinary action taken against him for insubordination, which was initiated on July 11, 2010. He offers no proof, however, that he engaged in any protected activity prior to

that date that could bear a "causal connection" to the insubordination charge. Further, even if he had engaged in protected activity following his involuntary commitment in September 2009, he has not shown that such activity continued long enough to be a possible cause of the complaint filed against him almost ten months later. *See Strong v. University Healthcare Sys., L.L.C.*, 482 F.3d 802, 807-08 (5th Cir. 2007) (holding that, even if an adverse employment action closely follows protected activity, temporal proximity alone does not support a claim for retaliation). Here, Plaintiff has failed to show a causal connection between any protected activity and the disciplinary action that was initiated on July 11, 2010. As a result, Plaintiff can claim, at best, that his probation was upheld as a result of his filing grievances regarding the insubordination charge, and his filing of his EEOC charge on July 21, 2010.[9]

The other subject of Fisher's retaliation claim is, of course, the disciplinary case initiated against him in September 2011, which ultimately led to his termination. (Plaintiff's Motion at Ex. 1, at 6). September 2011 is, however, quite remote from the resolution of his last grievance, which took place in January 2011, to establish a "but for" connection between that grievance and his termination. On all counts, then, Plaintiff is limited to the dubious claim that his probation, for insubordination, and his termination, for failing to perform the required "counts," resulted, at least in part, from his diligent pursuit of the grievance process and his July 2010 EEOC charge. However, the record lacks any evidence that there was, in fact, a "causal connection" between Fisher's protected activity and the adverse employment actions taken against him. Further, he

---

[9] While his grievances were pending on the insubordination charge, Fisher was charged, and ultimately given three-days' suspension and four months' probation, for another offense, "Sleeping on Duty." (Plaintiffs' Motion at Ex. 1, 4). Fisher has not based his lawsuit on that disciplinary action, however. Further, it does not appear that Fisher filed a grievance about that matter, and the record shows that he chose not to attend the disciplinary hearing. (*Id.*). Under these circumstances, the "Sleeping on Duty" charge and subsequent discipline appear to have had no impact on him for purposes of a retaliation claim.

certainly has not shown that, "but for" any protected activity, he would not have been charged with insubordination. *See Nassar*, 2013 WL 3155234, at *15-16.

Even had Plaintiff established a *prima facie* case of retaliation, however, Defendants have shown that they had a legitimate, non-retaliatory reason for their decisions to put him on probation in January 2011, and to terminate him in November of that year. *See Jenkins*, 487 F.3d at 316-17 (citing *Sherrod*, 132 F.3d at 1121-22); *LeMaire*, 480 F.3d at 388. As to the insubordination charge, which led to the three-month probation, Defendants have shown, through documents, sworn statements, and Plaintiff's own testimony, that there was sufficient evidence of Fisher's insubordination (walking out during a disciplinary meeting, and calling Lt. Villegas a "dumbass") to discipline him. (Defendants' Motion at Ex. 1, 5, 6). Through sworn statements and a copy of TDCJ policy, Defendants have also shown that probation is an appropriate disciplinary measure for such insubordination. (*Id.*). Plaintiff has not raised a genuine issue of material fact to rebut those matters.

As to his termination, Defendants also present sufficient evidence of the offense and the reasonableness of the decision to fire Fisher. (*Id.*). In fact, it should be emphasized that the decision to terminate Fisher was made only after the recommendation was independently approved by a chain of officers, culminating with Thaler. (Plaintiff's Motion at Ex. 1, at 13-15). Plaintiff has offered no evidence that raises a genuine issue of material fact on whether Defendants' proffered reasons are "actually a pretext for retaliation." *See LeMaire*, 480 F.3d at 388; *see also Jenkins*, 487 F.3d at 316-17 (citing *Sherrod*, 132 F.3d at 1121-22). Accordingly, summary judgment in Defendants' favor is warranted on Plaintiff's claim for retaliation.

*Section 1983*

Although Plaintiff comments that he was deprived of "due process," it is not clear that he intended to bring a claim against TDCJ and Warden Hirsch for civil rights violations under §1983 specifically.   In their motion, however, Defendants argue in an abundance of caution against a § 1983 claim. (Defendants' Motion at 11-14).  For that reason, and because Plaintiff is proceeding *pro se*, the court will consider whether Fisher has raised a claim under that statute.

"A claim for relief under § 1983 must allege the deprivation of a right secured by the Constitution or the laws of the United States by a defendant acting under color of state law." *Calhoun v. Hargrove*, 312 F.3d 730, 734 (5th Cir. 2002) (*Wong v. Stripling*, 881 F.2d 200, 202 (5th Cir. 1989)).  "The requirements of procedural due process are 'flexible and call[ ] for such procedural protections as the particular situation demands.'" *Gibson v. Texas Dept. of Ins.-Div. of Workers' Comp.*, 700 F.3d 227, 239 (5th Cir. 2012) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).  "At a minimum, due process requires that notice and an opportunity to be heard 'be granted at a meaningful time and in a meaningful manner.'" *Id.* (quoting *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972)).  In this case, Fisher has presented no evidence that he was denied due process during his employment activity with TDCJ.   Instead, the overwhelming evidence shows that the "involuntary commitment," the probation for insubordination, and the termination took place after numerous opportunities for review with his supervisors and allowing Fisher to tell his version of events. (Plaintiff's Motion at Ex. 1; Defendants' Motion at Ex. 1, 5, 6).  As a result, to the extent that Plaintiff intended to bring a claim for a civil rights violation under § 1983, that claim fails, and summary judgment in Defendants' favor should be granted.

In sum, Defendants have shown that there is no genuine issue of material fact that remains for trial on Plaintiff's pending claims.   It is recommended, therefore, that summary

judgment be entered in favor of Defendants, and that Plaintiff's motion for summary judgment be denied. It is also recommended that all remaining discovery or dispositive motions be deemed moot.[10]

## Conclusion

Accordingly, it is **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED**, and that Plaintiff's motion for summary judgment be **DENIED**.

It is also **RECOMMENDED**, in addition, that all pending motions be deemed **MOOT**.

It is further **RECOMMENDED** that this case be **DISMISSED**.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c). Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 5th day of July, 2013.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**

---

[10] As of the date of this memorandum, these motions include the following: Plaintiff's Default Judgment Request, Preliminary List of Witnesses to Depose and E-File, Docket Entry #34; Plaintiff's Motion for Production of Documents, Docket Entry #40; Plaintiff's Motion for Mediation or ADR, Docket Entry #54; Plaintiff's Motion to Address the Defenses['] Idiacies, Docket Entry #55; and Plaintiff's Motion for In-Camera, Docket Entry #60.